IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWRENCE STUART, | : | |
| Plaintiff, | : | 1:18-cv-0430 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| KIMBERLY MURRAY, *et al.*, | : | |
| Defendants. | : | |

# **MEMORANDUM**

### **November 16, 2020**

Lawrence Stuart ("Stuart" or "Plaintiff"), at all relevant times, an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), incarcerated at the State Correctional Institution at Mahanoy ("SCI-Mahanoy), Frackville, Pennsylvania, filed this civil rights action pursuant to 42 U.S.C. § 1983, on February 15, 2018, alleging Defendants Kimberly Murray ("Murray"), Janice Hale ("Hale"), Margaret Ward ("Ward"), John Steinhart ("Steinhart") Corrections Health Care Administrator, Kimberly Minarchick ("Minarchick"), Superintendent Delbalso ("Delbalso"), Dorina Varner ("Varner") (collectively referred to as "DOC Defendants"), and medical doctor Courtney Rodgers ("Rodgers"), were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment of the Constitution.  (Doc. 1).

Pending are Defendants' motions (Docs. 89, 90, 93) for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below,

the Court will grant Defendants' motions for summary judgment.

**I.     STANDARD OF REVIEW**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the

absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he

non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

## II.   STATEMENT OF MATERIAL FACTS

Defendants filed joint statements of material facts detailing Stuart's medical

encounters beginning in February 2016, with the report of a hernia, and ending in May 2018. (Docs. 91, 95). In response, Stuart states "[t]his case is not about the plaintiff [sic] hernia or his diagnosis of diabetes. This case is about DOC Defendant's [sic] Hale, Ward, Murray and Renninger[1] denying the plaintiff Stuart medical treatment. On 6-10-2016 the plaintiff fell out, and receive [sic] no medical treatment" which was caught on a video provided to the Court on March 8, 2019. (Doc. 102, ¶ 2; Doc. 103, ¶ 2; Doc. 106). He further clarifies that his "complaint is not solely based on his fall on June 10, 2016, rather the failure of these Defendants to provide adequate treatment from June 10, 2016 through June 19, 2016, which began with Stuart experiencing symptoms of feeling weak, dizziness, lightheadedness, and pain in his groin." (*Id.*; *Id.*). The statement of material facts will therefore be confined to the pertinent time period.

On May 26, 2016, Stuart complained of dizziness to registered nurse Jodie Martino ("Martino"). (Doc. 91, ¶ 7; Doc. 95, ¶ 8; Doc. 102, ¶ 8; Doc. 103, ¶ 7). His vitals and physical exam were normal and Martino concluded that he exhibited no signs or symptoms of dizziness. He also complained of constipation; Martino instructed him to submit a sick call request to address this concern and to increase his fluid intake. Dr. Khanum signed Martino's notes on May 31, 2106.

---

[1] Renninger has been dismissed from the action. (Doc. 87).

5

On May 31, 2016, physician's assistant Nancy Palmigiano ("Palmigiano") attended to Stuart at sick call.  (*Id.* at 8; *Id.* at 9; *Id.* at 9; *Id.* at 8).  He reported weight loss, which was confirmed.  Palmigiano noted that Stuart suffered a loss of weight since September 2015.  She also noted that he presented with appropriate speech, a steady gait, and normal pupils.  She ordered bloodwork to test for anemia, infection, or thyroid problems.  Also, she informed him that he was scheduled for a urology telemedicine appointment.

On the morning of June 10, 2016, psychologist Sarah Falkson ("Falkson") met with Stuart on his cell block after reports that he told the block officer he was hearing and seeing things that were not there.  (*Id.* at 9; *Id.* at 10; *Id.* at 10; *Id.* at 9).  He also expressed that he had a number of medical concerns.  Falkson contacted psychiatry, and psychiatry instructed her to contact the medical department.  She noted that medical personnel assessed Stuart on his block but, by that time, he was no longer hearing or seeing things.  He made several references to filing grievances and lawsuits.  Falkson assessed his behavior as hostile and demanding, found his insight limited, and determined his perceptions to be grandiose.  She indicated he was "[a]gitated, manipulative, appears to be exaggerating mental health symptoms to achieve a personal gain (medical treatment).  Complaints regarding the medical department appear to be associated with entitlement and lack of patience as well as

6

wanting information about appointment times that cannot be given out for security reasons." She also noted that he exhibited no physical impairments and was oriented to person, place, and time.

In the medical progress notes, Defendant Ward, a registered nurse, noted that medical was called to DB block after Stuart made a claim that his "testicle is falling out." (*Id.* at 10; *Id.* at 11; *Id.* at 11; *Id.* at 10). She examined him and detected a receding testicle, a known, chronic problem. She advised him to continue taking Motrin until he had his urology consultation. Thereafter, upon his insistence, he was transported to the medical department and attended to by Dr. Robel. Dr. Robel informed him that his urology consultation had been approved and that he should return to the block. He refused to leave. Eventually, a correctional officer escorted him out of the medical department.

A surveillance video shows Stuart leaving the medical department and, within steps of the door, tipping to the right and falling to the ground. (Doc. 106). Defendant Ward noted that Stuart "proceeded to throw himself to [the] ground and refused to get into [a] wheel chair." Stuart maintains that Defendants Ward, Hale, and Murray, all registered nurses, were present after the fall and that Murray told him to "get up and stop faking." (Doc. 97, p. 2). A correctional officer and Defendant Ward assisted him into a wheelchair and took him back to the medical

department. Stuart asserts that Defendants failed to examine him. According to the medical notes, no injuries were noted and he was discharged back to his block.

He had a blood workup and urinalysis sample taken on June 17, 2016. His June 19, 2016 results showed elevated glucose levels. (Doc. 91, ¶ 11; Doc. 103, ¶ 11). He indicates that "Defendants let [him] suffer for nine days before taking his complaints serious[ly] on June 20, 2016." (Doc. 103, ¶ 11). He further states that the fact that he was ultimately diagnosed with diabetes is proof that his fall outside of medical was the result of his symptoms and not attention seeking behavior as alleged by DOC Defendants. (*Id.*).

On June 20, 2016, Stuart reported to nurse Amy Kratz ("Kratz") that he was dizzy, was drinking a lot, and was experiencing excessive urination, cramping and dry mouth. (Doc. 91, ¶ 12; Doc. 103, ¶ 12). His vitals were taken and his blood sugar was checked. Upon being made aware of Stuart's blood sugar, weight loss, and lab results, Dr. Eisenberg directed that he be monitored and scheduled for the doctor's line. Later that day, Dr. Khanum saw Plaintiff in triage and noted that his morning fasting sugar was 436, and that he had been sent back to medical to start insulin. Dr. Khanum opined that he had new onset hyperglycemia. She admitted him to the infirmary for 23 hour observation, ordered that an IV be administered, prescribed Metformin 850mg twice daily, and directed that a basic

metabolic panel be done the following morning.

On the morning of June 21, 2016, he had no signs or symptoms of hypoglycemia. Nurse Deborah Fryer ("Fryer"), contacted Dr. Stirling who gave orders for insulin. Stuart later complained to Dr. Khanum of constipation, blood during bowel movement, and fatigue. He denied having chest pain, shortness of breath, or sweating, and reported that his thirst and frequent urination had lessened. Although his blood sugar had improved with treatment, Dr. Khanum determined that he had new onset diabetes. He was educated on the condition, instructed to continue with Accu-check twice per day, and prescribed Metformin 850mg twice per day, Atorvastatin (Lipitor), Colace 100mg twice per day and a glycerin suppository. He was approved for discharge to his block and advised to increase hydration and return to sick call in three days. He was also added to the Chronic Care Clinic. Dr. Khanum also noted that, on that same day, Stuart was seen by an offsite urologist for left testicular pain secondary to epididymitis and infarct. He was to start antibiotics, and an orchiectomy, removal of the testicle, was recommended when his diabetes became controlled.

On June 11, 2016, Stuart sent an "Inmate's Request to Staff Member" to Defendant Steinhart, the Corrections Health Care Administrator, seeking an investigation into the June 10, 2016 incident. (Doc. 1, p.6, ¶ 9; p. 18). On June 24,

2016, he filed Grievance Number 631977 concerning the events of June 10, 2016. (Doc. 91, ¶ 18; Doc. 95, ¶ 18; Doc. 102, ¶ 18; Doc. 103, ¶ 18).  Defendant Minarchick denied the request noting that after leaving the medical department he was witnessed falling and it did not appear that he hit his head.  (Doc. 91-2, p. 5). She noted that he had no areas of swelling, redness, or skin abrasions or apparent injuries and that he was assisted into a wheelchair and seated in the medical department while medical personnel reviewed the surveillance video.  She stated that it appeared from the video that he did not hit his head.  (*Id.*).  She indicated that he refused to leave the medical department so he was transported back to the block *via* a wheelchair.  It was also noted that he was added to chronic clinic for diabetes treatment.  (Doc. 91, ¶ 19; Doc. 95, ¶ 19; Doc. 102, ¶ 19; Doc. 103, ¶ 19). Minarchick's denial of the grievance was upheld by Defendants Delbalso and Varner.  (Doc. 91-2).

Defendant Dr. Rodgers began working at SCI-Mahanoy on July 25, 2016. (Doc. 93-3; Doc. 95, ¶ 25[2]; Doc. 102, ¶ 25).

## III.  DISCUSSION

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  *See* 42 U.S.C. §

---

[2]  The statement of material facts misidentifies the year Defendant Rodgers began working at SCI-Mahanoy.  The correct year, per Defendant Rodgers' declaration, is 2016.  (Doc. 93-3).

10

1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.; see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002*); Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under §1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A. Defendant Rodgers

Defendant Rodgers seeks an entry of summary judgment based on a lack of personal involvement in the June 2016 conduct of which Stuart complains. Individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence."

*Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003); *Rode*, 845 F.2d at 1207-08. A plaintiff must establish the particulars of conduct, time, place, and the person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of or personal involvement in the deprivation of his or her rights, individual liability will not follow. *Atkinson*, 316 F.3d at 271; *Rode*, 845 F.2d at 1207-08.

In the matter *sub judice*, it is undisputed that Defendant Rodgers did not begin working at SCI-Mahanoy until July 25, 2016, more than a month after the disputed events. Accordingly, he is entitled to an entry of summary judgment.

### B. DOC Defendants

#### 1. Defendants Murray, Hale, and Ward

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. *Id.* at 104-05. To succeed on such a claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting *Rouse v. Plantier*, 182

12

F.3d 192, 197 (3d Cir. 1999)).

Deliberate indifference occurs when prison officials "intentionally deny[ ] or delay[ ] access to medical care or interfer[e] with the treatment once prescribed." *Pearson*, 850 F.3d at 534 (quoting *Estelle*, 429 U.S. at 104-05).  A mere complaint "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment[.]" *Estelle*, 429 U.S. at 106.  Moreover, "mere disagreement as to the proper medical treatment does not support a claim of" deliberate indifference.  *Pearson*, 850 F.3d at 535 (internal quotations omitted); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3rd Cir.1987).  Rather, where there has been medical care, "we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id.*  As long as a physician exercises professional judgment, his or her behavior does not violate a detainee's constitutional rights.  *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).

We begin with the events of June 10, 2016.  On that date, upon being dispatched to DB Block to address Stuart's complaint that his "testicle is falling out" Defendant Ward examined him and detected a receding testicle, a known, chronic problem.  She suggested that he continue taking Motrin until he had his

13

urology consultation. Despite being attended to and examined, he insisted on being transported to the medical department. Upon being apprised of Stuart's issues, Dr. Robel directed Defendant Ward to inform him that his urology consultation had been approved and instruct him to return to his block. (Doc. 93-1, p. 144). Because he refused to leave the medical department, he was escorted out by a correctional officer. Once outside, Stuart fell. Review of the surveillance video shows that, within steps of the medical department door, he tipped to the right and fell to the ground. The video does not conclusively demonstrate that Stuart intentionally fell to the ground. Nor does it unequivocally show whether he hit his head in the fall. Nonetheless, after he fell, Defendants Ward, Hale, and Murray were immediately on the scene. They assisted him into a wheelchair and he was returned to the medical department and evaluated. He sustained no abrasions, contusions, and did not display any redness, swelling, or outward sign of injury. Further, medical personnel concluded from the video that he did not suffer a head injury. Therefore, he was discharged and escorted back to his block.

    No reasonable factfinder could conclude from this record that Defendants acted with deliberate indifference to Stuart's serious medical needs. Although Stuart reasserts, as alleged in his complaint, that on that same evening "due to his continued bouts of lightheadedness, dizziness and vomiting Lieutenant Trometter

did transport [him] back to the medical department, where nursing staff once again sent [him] back to his housing unit without faking his injuries/complaints," he provides no evidence in support of this allegation. Nor does he allege that the named Defendants were among the medical staff that allegedly turned him away that evening. (Doc. 1, ¶ 8; Doc. 97, p. 2). There simply is no evidence, at any point during the various events and medical interactions that transpired on June 10, 2016, that Defendants Murray, Hale or Ward intentionally denied Stuart medical treatment, delayed access to medical care, or interfered with any prescribed course of medical treatment.

     Stuart also contends that Defendants exhibited deliberate indifference to his serious medical needs in failing to ascertain that the symptoms he experienced on June 10, 2016, as well as the fall he sustained upon leaving the medical department, were related to his diabetes diagnosis. On May 26, 2016, Stuart complained of dizziness to nurse Martino. His vitals and physical exam were normal and he exhibited no signs or symptoms of dizziness. On May 31, 2016, physician's assistant Palmigiano noted that Stuart suffered a loss of weight since September 2015, which prompted her to order bloodwork to test for anemia, infection, or thyroid problems. At the time, his speech was appropriate, his gait was steady and his pupils were normal. On June 10, 2016, by the time medical

arrived to address Stuart's medical complaints, the only issue he raised was related to his chronic testicular issues. The record does not permit us to conclude that Defendants were deliberately indifferent in failing to appreciate that the symptoms Stuart was experiencing on June 10, 2016, and his fall outside the medical department, were indicative of diabetes.

Notably, Stuart's diabetes diagnosis did not come until approximately ten days later. The June 19, 2016 results from his June 17, 2016 bloodwork and urine sample, revealed that he had elevated glucose levels. On June 20, 2016, after reporting various symptoms including dizziness, excessive urination, cramping and dry mouth, nurse Kratz took his vital signs and tested his blood sugar. She advised Dr. Eisenberg of Plaintiff's blood sugar, weight loss and recent lab results and the doctor ordered that he be monitored and scheduled for triage. Later that same day, Dr. Khanum determined that Stuart had new onset hyperglycemia and directed that he be admitted to the infirmary for observation and blood sugar checks. She instructed that he be given Metformin, 850 mg, twice daily, and that a metabolic panel be repeated the next day. The monitoring continued and, on the morning of June 21, 2016, there were no symptoms of hypoglycemia. Nurse Fryer contacted Dr Stirling that morning and the doctor gave orders for insulin. Later in the day, Dr. Khanum again attended to Stuart and concluded that he had new onset

diabetes. She educated him on the condition, instructed him to continue blood sugar tests twice daily, and provided various prescriptions. She advised him to increase hydration and return to the sick call line in three days. She also added him to the Chronic Care Clinic. Dr. Khanum also noted that Stuart had been seen by an offsite urologist for left testicular pain that day and that the urologist started a regimen of antibiotics, and recommended surgical removal of the testicle when the diabetes became controlled.

It is clear that professional judgment was exercised by Defendants in addressing Stuart's medical complaints and rendering treatment from June 10, 2016 through the date of his diabetes diagnosis. As such, we are precluded from finding that they acted with the "obduracy and wantonness" necessary to sustain an Eighth Amendment violation, *see Whitley v Algers*, 475 U.S. 312, 319 (1986). Defendants Murray, Hale and Ward are entitled to an entry of summary judgment.

### 2. Defendants Steinhart, Minarchick, Delbalso, and Varner

Stuart seeks to impose liability on Defendants Steinhart, Minarchick, Delbalso, and Varner for their roles in adjudicating Grievance Number 631977. (Doc. 1, pp. 1, 9; ¶¶ 9, 16, 17). The "after-the-fact" review of a grievance, or an inmate's dissatisfaction with a grievance response, do not establish the involvement of officials and administrators in any underlying constitutional

deprivation. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) (finding where a defendant, after being informed of the violation through the filing of grievances, reports or appeals, failed to take action to remedy the alleged wrong is not enough to show that the defendant has the necessary personal involvement); *Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008) (not precedential) ("The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them."); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (not precedential) (holding that allegations that prison officials responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying constitutional deprivation).  These Defendants are also entitled to an entry of summary judgment.

## IV.  **CONCLUSION**

Based on the foregoing, Defendants' motion (Doc. 46) for summary judgment will be granted.

An appropriate Order will issue.